

**FILED**
**Jul 24, 2026**
**02:59 PM(CT)**
**TENNESSEE COURT OF**
**WORKERS' COMPENSATION**
**CLAIMS**

# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# IN THE COURT OF WORKERS' COMPENSATION CLAIMS
# AT JACKSON

| | |
|---|---|
| PETER RHEA,<br>　　　　**Employee**,<br>v.<br>**TITAN TRANSFER, INC.**,<br>　　　　**Employer**,<br>**and**<br>**PROTECTIVE INS. CO.**,<br>　　　　**Insurance Carrier.** | Docket No. 2025-80-0701<br><br>State File No. 50622-2018<br><br>Judge Amber E. Luttrell |

## COMPENSATION ORDER

Mr. Rhea sought permanent and total disability benefits for a work injury. The issues include: 1) whether Mr. Rhea's lower-extremity contracture injuries primarily arose from his injury; 2) whether his inability to walk primarily arose from his injury; and 3) whether he is entitled to permanent total or permanent partial disability benefits. For the reasons below, the Court finds Mr. Rhea established his injuries are compensable and he is entitled to permanent and total disability.

## Claim History

Mr. Rhea worked for Titan Transfer in multiple positions, including shop foreman, lead diesel mechanic, and maintenance manager.

On June 27, 2018, he suffered a crush injury to his lower extremity at work, sustaining multiple fractures to his pelvic ring and distal femur, nerve damage, with later equinus contractures. He also later injured both shoulders from using a manual wheelchair.

*Treatment and Expert Proof*

Mr. Rhea saw different authorized physicians for treatment, but he primarily treated with Dr. Michael Beebe, an orthopedic surgeon with a subspecialty in

1

trauma. Dr. Beebe testified that these conditions and need for treatment primarily arose of out of the work injury.

Since 2018, Mr. Rhea has undergone six surgeries. He received physical therapy and medication through pain management. He attained maximum medical improvement on February 9, 2021.

Titan accepted Mr. Rhea's multiple fractures and bilateral shoulder injuries but disputed causation for Mr. Rhea's bilateral neuropathy and equinus contractures.

According to Dr. Beebe, equinus contractures occur when, "the heel cord of the Achilles' tendon gets tight to the point that the foot can no longer go flat, and the toes or the foot itself is pointing downward." He explained that after the work injury, Mr. Rhea developed "a pretty significant stocking type pattern neuropathy," which means that his leg was numb and weak from the shin down and the front muscles of the leg became weak. This allowed the heel cord to tighten and pull the foot downward. Mr. Rhea also had foot drop.

Mr. Rhea had no history of equinus contractures or foot drop before the injury, and it acutely developed after the injury. He underwent corrective surgeries for the equinus contractures, with tendon transfers to help prevent it from recurring.

Dr. Beebe also explained that multiple nerve roots come out of the pelvic ring that were injured during the crush injury, causing a traumatic nerve injury. He believed Mr. Rhea also had a "polyneuropathy, meaning it involved multiple nerve roots," which was confirmed by EMG.

Additionally, Mr. Rhea had preexisting diabetes and experienced an acute episode of ketoacidosis during one of his surgeries. Dr. Beebe said this episode might have been a contributing factor to him developing acute-onset polyneuropathy. He did not know exactly what caused the ketoacidosis, but he said his history of underlying diabetes and the surgery and anesthesia were likely contributing factors. He explained that the surgery itself releases corticosteroids, which increase blood sugar. Also, the drugs and IV drips administered during surgery contain sugar.

Dr. Beebe testified that Mr. Rhea's injury aggravated, exacerbated, or worsened his "nerve associated issues, the polyneuropathy, the issue with both the legs." A pelvic ring injury is the type of injury that worsens neuropathy.

2

He stated that Mr. Rhea requires the use of a wheelchair or walker to move about, which was primarily caused by his work injury. Mr. Rhea is "essentially wheelchair bound with pretty significant assistance [needed] even for transferring, and . . . needs relatively frequent position changes to prevent issues such as skin breakdown." As a result, Dr. Beebe said, "the vast majority of careers would be difficult for him."

Dr. Beebe concluded that Mr. Rhea's injuries are permanent, but he did not testify about an impairment rating because he does not perform his own impairment evaluations.

On cross-examination, Dr. Beebe was questioned about Mr. Rhea's pre-injury endocrinology treatment. He stated the records showed he had preexisting diabetic neuropathy "from a subjective standpoint . . . [but] from an exam standpoint, he [had] normal sensation, normal vibratory sensation, normal strength, and . . . no reported objective findings of diabetic neuropathy."

Dr. Beebe disagreed with Titan that Mr. Rhea's muscle weakness and inability to walk were more attributable to his diabetic neuropathy than his injury. He explained,

> Prior to the injury, he did not require any assistive devices to ambulate, regardless of his subjective report of polyneuropathy, his motor and sensory was normal on physical exam by the podiatrist, and he was working and ambulating. And after the injury, he has never shown progress back to normal activity. His progression even in therapy is well below what I would anticipate for somebody at his age and prior functional status.

Dr. Beebe concluded that the weakness in his lower extremities occurred in the hospital immediately after the injury and surgery.

On redirect, Dr. Beebe confirmed that Mr. Rhea's preexisting endocrinology treatment and therapy records did not change his causation opinions as to Mr. Rhea's injuries or his lack of mobility, nor did they alter his testimony regarding Mr. Rhea exacerbating and/or aggravating any preexisting diabetic neuropathy.

Mr. Rhea saw Dr. Keith Nord for an independent medical evaluation in 2025 and for an impairment rating. Dr. Nord spent one hour examining Mr. Rhea and three hours reviewing his records and preparing his report. Like Dr. Beebe, Dr. Nord also

testified that Mr. Rhea's work injury was the primary cause of his injuries and current condition.

He reviewed treatment records of Mr. Rhea's preexisting diabetes and his ketoacidosis and said,

> Diabetic ketoacidosis occurred during the surgery and post-operatively, so it was caused by the injury based on that. Even though he had the underlying diabetes, it triggered that response. Increased stress, infection, all kinds of things like that can trigger diabetic ketoacidosis. The severe bout of that did cause his neuropathy to become substantially worse.

Dr. Nord said that Mr. Rhea's work was more than 50% the cause of his condition, and "[I]t's more common for a crush injury to cause weakness and contractures and atrophy than it is diabetic ketoacidosis to cause those."

Dr. Nord assigned 48% impairment, which consisted of 2% for the distal femur fracture, 4% for each ankle, 10% for the ankle fracture, 2% for each shoulder, 28% for inability to ambulate, and 6% for dysesthetic pain.[1] He determined Mr. Rhea would need ongoing care: ongoing pain management, home assistance and care, and continued therapy including aqua therapy. He considered Mr. Rhea unable to return to his previous job and permanently disabled.

On cross-examination, Dr. Nord stated that "the exacerbation of the specific episode with the diabetic ketoacidosis was triggered by the increased stress of the accident and surgery." It caused a permanent nerve injury. "I think it increased the neuropathy. I can't say for sure that it caused muscle motor changes. . . [T]hat could also come from the femur. It can come from crush of the nerve, even if it wasn't the fracture itself." When asked why Mr. Rhea cannot walk now when he was progressing in therapy early on, Dr. Nord responded that Mr. Rhea had "progressive atrophy in his muscle as well as the flexion contractures in both ankles." He explained that "[H]e has significant atrophy in his legs now as well, and that's making him much weaker, making it harder for him to walk."

Mr. Rhea also saw Dr. David West for an employer evaluation. Dr. West agreed with Dr. Nord's causation opinion and ratings for the pelvic ring fracture,

---

[1]Dysesthesia is a type of neuropathic pain. https://myclevelancclinic.org/health/symptoms/24989-dysesthesiia (last visited July 22, 2026).

4

distal femur fracture, and shoulder ratings, for a combined 16% impairment. He disagreed, however, that Mr. Rhea's lower-extremity contractures primarily arose out of his injury and did not assign impairment for those conditions.

Dr. West said he did not know definitively what caused the contractures, but it was not due to diabetic ketoacidosis. He thought the contractures were a "normal ordinary disease of life of deconditioning" and not related to his surgeries or his ketoacidosis episode. He referenced the EMG findings and said Mr. Rhea "most likely had an underlying and most likely chronic, longstanding neuropathy to his underlying condition of diabetes."

He also stated that Mr. Rhea's gait derangement and inability to walk were not primarily related to the work injury. Dr. West attributed it to deconditioning over the years from the progression of diabetic neuropathy, and he referenced therapy records he believed showed him walking without assistance. He noted Mr. Rhea's participation in his daughter's wedding, which he believed was without assistance.

On cross-examination, Dr. West admitted he "did not recall" reading Mr. Rhea's deposition and had no specific details about how he walked his daughter down the aisle. He also did not know the "mechanism of what might have been used to assist him during physical therapy visits" to walk various distances. He acknowledged that he did not know why Mr. Rhea developed the equinus contractures. He also did not recall if he reviewed Mr. Rhea's endocrinology records, Dr. Nord's deposition, or Dr. Beebe's deposition.

*Lay Proof*

Mr. Rhea is a high school graduate with a diesel mechanic certification. His job duties at Titan included maintaining the trucks, climbing in and out of trucks and trailers, and working under them. He was on his feet all day, with extensive twisting, turning, and heavy lifting. He worked with tires weighing over 200 pounds. The shop was open at least nine hours every day, and Titan ran trucks 24 hours a day, so Mr. Rhea was on call if a truck broke down after hours. Before his injury, Mr. Rhea had no difficulty performing his job and had no restrictions.

Mr. Rhea testified about his evaluations with Dr. Nord versus Dr. West. He said Dr. Nord's physical exam was detailed, in that "he went through the steps they would do in a functional capacity evaluation." Dr. Nord examined his entire person, including his arms, legs, shoulders, ability to stand, strength in his limbs, and muscle mass.

5

Mr. Rhea said his visit with Dr. West, on the other hand, was short, "maybe 15-20 minutes." He said Dr. West did not check his legs beyond touching his legs and arms to do a "light strength test." Most of his visit consisted of Dr. West asking him background questions because he had not reviewed his medical history.

Mr. Rhea said Dr. Beebe was his primary surgeon and oversaw all his treatment and therapies. He continues to see Dr. Beebe.

Since the injury, he has progressively lost muscle mass and become weaker. Early on, he was gaining strength, but with time and not working, he lost it. Mr. Rhea is totally dependent on a wheelchair, as he is unable to stand or walk unassisted. His electric wheelchair and the lift apparatus on his vehicle for the chair are broken. Thus, he uses his manual wheelchair, which he stated caused a rotator cuff tear in one shoulder and tendinitis in the other. He attended the trial in his manual wheelchair.

Mr. Rhea requires caregiver assistance with all daily functions, including using the bathroom, cleaning, getting dressed, preparing and bringing him meals, and assisting him with transfers to and from the bed and wheelchair. He requires a spotter because he is "wobbly," and if his arms give out, he will fall. He takes multiple medications, which cause side effects such as irritability, drowsiness, depression, itching, and dry mouth. He cannot drive because his vehicle does not have hand controls.

On cross-examination, Mr. Rhea testified about his preexisting diabetes. He was diagnosed in 2006 or 2008, and over time it had not progressed. It improved "after he got his sugar regulated and improved his eating." He acknowledged he may have had some tingling in his extremities in the past.

During his early therapy in 2019, Mr. Rhea was able to take some steps, but only with assistance from a walker, a gait belt, and a therapist. In early 2020, he walked some in therapy with special crutches and a therapist holding a gait belt.

Mr. Rhea also explained how he walked his daughter down the aisle. He was only able to do so with the assistance of three people, a gait belt, and his daughter helping to hold him up.

Mrs. Rhea's testimony mirrored her husband's. She added that he had no limitations on activities at home before his injury, but now he needs help with "everything."

Dana Stoller testified as a vocational expert for Mr. Rhea. Ms. Stoller noted Dr. Beebe's permanent restrictions: "unable to work, wheelchair or walker, unable to get out of the house independently." She performed a transferrable-skills analysis and labor market research. She concluded that Mr. Rhea is permanently and totally disabled, and no job opportunities exist within the competitive labor market in his present condition.

Titan offered no vocational expert proof.

## Findings of Fact and Conclusions of Law

At a Compensation Hearing, Mr. Rhea must show by a preponderance of the evidence that he is entitled to benefits. Tenn. Code Ann. § 50-6-239(c)(6) (2025).

### *Injury and Impairment*

The issue was whether Mr. Rhea's lower-extremity contractures and resulting surgeries primarily arose from his work injury. Titan also challenged whether Mr. Rhea's inability to use his legs and walk are related to the work injury or due to non-work-related causes, his diabetes.

Mr. Rhea must show that these conditions arose primarily out of the course and scope of employment. Further, he must show that the injury to a reasonable degree of medical certainty contributed more than 50% in causing the need for treatment, considering all causes. *Id.* § 50-6-102(12).

In evaluating conflicting expert testimony, a trial court may consider, among other things, "the qualifications of the experts, the circumstances of their examination, the information available to them, and the evaluation of the importance of that information through other experts." *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 676 (Tenn. 1991).

Here, all three doctors are experienced orthopedic physicians and are well-qualified to give opinions.

As for the circumstances of their examinations and the information available, this factor heavily favors Dr. Beebe, and to a lesser extent, Dr. Nord. Dr. Beebe has regularly seen and treated Mr. Rhea for the last *eight years*, performed surgery,

ordered numerous tests, ordered therapy, assigned restrictions, ordered equipment, overseen his treatment with other specialists, and managed his medication. He continues to see Mr. Rhea. Dr. Beebe also reviewed and is familiar with *all* medical information available regarding Mr. Rhea's injury and treatment to date. "It seems reasonable that the physicians having greater contact with the Plaintiff would have the advantage and opportunity to provide a more in-depth opinion, if not a more accurate one." *Id.* at 677.

Dr. Nord, as Mr. Rhea's evaluating physician, saw him once but performed a thorough exam. He documented spending one hour examining Mr. Rhea and spending three hours reviewing his records. Dr. Nord summarized his treatment history in his report. Mr. Rhea testified he received a thorough exam from Dr. Nord similar to a functional capacity evaluation.

Dr. West, as Titan's evaluating physician, also saw Mr. Rhea once and, based on Mr. Rhea's uncontroverted testimony, spent less time examining him and most of his time questioning him because he had not yet reviewed his medical history. That testimony was bolstered by Dr. West's own testimony. He was unsure if he had reviewed Mr. Rhea's preexisting endocrinology records and "d[id] not recall" reviewing Mr. Rhea's testimony as to his condition or the testimony from the other experts.

The parties disputed whether Dr. Beebe's causation opinion is afforded a presumption of correctness under section 50-6-102(12)(E). Titan argued no presumption attached because it did not offer Mr. Rhea a panel. The parties introduced no proof on this point. The Court finds, regardless of the presumption, that Dr. Beebe's causation opinion was compelling and deserves greater weight.

The Court is persuaded by Dr. Beebe's unequivocal opinion that Mr. Rhea's lower-extremity contractures and resulting surgeries, traumatic nerve injuries, and acute onset polyneuropathy primarily arose from the work injury. He acknowledged that Mr. Rhea's preexisting diabetes likely contributed to polyneuropathy, but he did not waver from his causation opinion. The records showed subjective diabetic neuropathy only. From an exam standpoint pre-injury, Mr. Rhea had normal sensation, normal strength, and no reported objective findings of diabetic neuropathy. To the extent the ketoacidosis episode contributed to his polyneuropathy, Dr. Beebe said that Mr. Rhea's surgery and anesthesia likely contributed because surgery causes an increase in blood-sugar levels.

Dr. Beebe further testified that Mr. Rhea's injury aggravated, exacerbated, or

worsened any nerve-associated problems with both legs.

The Court is further persuaded by Dr. Beebe's opinion that Mr. Rhea's need for a wheelchair or walker was primarily caused by his work injury, rather than his diabetes. Before the injury, Mr. Rhea required no assistive devices to walk, regardless of any subjective report of polyneuropathy. His motor and sensory exams were normal, and he was working without restrictions. After the injury, he has never progressed back to normal.

Dr. Nord, likewise, concluded that Mr. Rhea's work injury was the primary cause of his injuries and current condition. He attributed Mr. Rhea's inability to walk to progressive atrophy in his muscles and flexion contractures in both ankles, making him much weaker. He assigned 48% impairment for Mr. Rhea's injuries and supported it under the AMA Guides.

Further, Mr. Rhea's credible testimony was consistent with the opinions from Drs. Beebe and Nord.

In contrast, Dr. West's opinion was unconvincing that Mr. Rhea's contractures were simply a "normal ordinary disease of life of deconditioning" and his inability to walk was from deconditioning from the progression of diabetic neuropathy. This is especially true considering he also did not know *what* caused the lower-extremity contractures. Moreover, Dr. West's testimony showed he was less knowledgeable about Mr. Rhea's medical history, and he based his opinions, in part, on inaccurate information as to how Mr. Rhea was initially able to take steps in therapy and participate in the wedding.

Because Drs. Beebe and Nord gave the more persuasive and probable explanation, the Court finds that Mr. Rhea proved by a preponderance of the evidence that his lower-extremity contractures and inability to use his legs and walk primarily arose out of his work injury. He sustained a 48% total impairment.[2]

*Permanent Total Disability*

The extent of Mr. Rhea's vocational disability is a question of fact determined by consideration of all the evidence, both expert proof and lay testimony. *Duignan v. Stowers Mach. Corp.,* No. E2018-01120-SC-R3-WC, 2019 Tenn. LEXIS 224, at

---

[2] Mr. Rhea has also treated for incontinence since the work injury, but Dr. Beebe could not say the condition arose primarily out of the injury.

*22 (Tenn. Workers' Comp. Panel June 19, 2019). The relevant factors are Mr. Rhea's skills, training, education, age, local job opportunities, and ability to work at available jobs in his post-injury condition. *Id.* He is entitled to an award of permanent total disability benefits if his injury "totally incapacitates him from working at an occupation that brings an income." Tenn. Code Ann. § 50-6-207(4)(B).

Applying these principles, Mr. Rhea is a 56-year-old high school graduate with a diesel mechanic certification. He has been unable to return to work since the injury. Dr. Beebe said the injuries are permanent and "the vast majority of careers would be difficult for him." Dr. Nord similarly considered Mr. Rhea unable to return to his previous job and permanently disabled. Mr. Rhea is wheelchair bound, and he takes medications that make him drowsy, irritable and depressed. He needs assistance using the restroom, and he cannot drive. Ms. Stoller testified that Mr. Rhea is permanently and totally disabled, and no job opportunities exist that would be suitable for him. Importantly, her testimony was uncontroverted.

In sum, the evidence from the medical experts, Mr. Rhea, and Ms. Stoller showed by a preponderance that Mr. Rhea's injury totally incapacitated him from working at an occupation that brings an income. Thus, he is permanently and totally disabled.

Titan advanced permanent disability benefits from February 9, 2021, to July 23, 2026, totaling $212,882.43.[3] He is entitled to ongoing weekly benefits from July 24, 2026, until December 12, 2036, 542 weeks. *Id.* § 50-6-207(4)(A)(i).

The Court commutes 100 weeks of the award for Mr. Rhea's attorney's fees under subsection 50-6-207(4)(A)(ii)(a)-(b). Thus, the Court orders Titan to pay a lump sum of $75,112 (100 weeks times $751.12).

*Fees and costs*

Subsection 50-6-207(4)(a)(iii) provides that attorney's fees in permanent total disability cases shall be calculated on the first 450 weeks of disability only. Further, an attorney's fee shall not exceed 20% of the award. Specifically, Tennessee Supreme Court Rule 8, RPC 1.5 in relevant part states the Court shall consider the

---

[3] The pre-compensation hearing statement reflects that Titan advanced permanent disability from February, 9, 2021 to May 20, 2026, totaling $206,122.35. Titan filed a notice of updated permanent disability payments on July 23, 2026, which showed payments from May 21, 2026, to July 23, 2026, which totaled $6,760.08 (nine weeks at $751.12 rate).

results obtained, the amount of work required, the customary fee in a written agreement, and counsel's experience and reputation.

Counsel's motion for approval of attorney fee and declaration shows Mr. Barnes has practiced law for 20 years, he expended extensive time and effort prosecuting this case, and he had a written contract for fees. These facts support a 20% fee. Thus, of the 100-week commutation, counsel may take an attorney fee of $67,600.80 (90 weeks).

Titan's attorney's fees also exceeded $10,000. Counsel likewise submitted a motion and declaration, citing his approximately 18 years' practicing, his reputation and ability, and the substantial time expended. For the same reasons as employee's attorney, the Court finds employer's counsel's fees were appropriate and approves them.

Section 50-6-207(4)(ii)(c) requires that after the commuted lump sum is determined, the amount of the weekly permanent total disability payments shall be recalculated to distribute them in equal installments over the entire period of disability. Here, the remaining benefits after commutation equal $331,995.04 ($407,107.04, 542 weeks, less the 100-week commutation of $75,112). Thus, the balance of $331,995.04 shall be payable from July 24, 2026, until Mr. Rhea reaches eligibility for Old Age Social Security benefits, December 12, 2036, a total of 542 weeks and at the modified weekly rate of $612.54.

Finally, Mr. Rhea requested discretionary costs under Rule 54 of the Tennessee Rules of Civil Procedure totaling $9,203.65. Counsel requested $2,000 for Dr. Beebe's two depositions; $750 for Dr. Nord's deposition; $3,750 for Ms. Stoller's trial appearance; and $2,703.65 for multiple court reporter expenses.

In response, Titan noted Mr. Rhea voluntarily dismissed his first Petition for Benefit Determination under docket number 2022-08-0514. Counsel objected to costs requested from the dismissed case, as well as $3,750 for Ms. Stoller's trial appearance fee as excessive.

In reply, Mr. Rhea itemized the costs for each case. The costs in this case for Dr. Beebe's deposition, Dr. Nord's deposition, court reporter expenses, and Ms. Stoller's revised trial appearance fee totaled $3,692.15.

Section 50-6-239(c)(8) authorizes a trial court to "assess discretionary costs including reasonable fees for depositions of medical experts[,]" while Tennessee

Rules of Civil Procedure 54.04 provides for an award of discretionary costs for "reasonable and necessary court reporter expenses for depositions or trial [and] reasonable and necessary expert witness fees for deposition[.]" Additionally, the Appeals Board reduced the amount of costs awarded for an unsuccessful claim. *Oldham v. Freeman Webb Co. Realtors,* 2024 TN Wrk. Comp. App. Bd. LEXIS 37, at \*42 n.9 (Nov. 8, 2024).

Here, Mr. Rhea did not introduce expert proof from his dismissed case. Instead, he relied on the 2026 depositions of Drs. Beebe and Nord and Ms. Stoller's trial appearance fee in this case. Thus, the Court finds the requested discretionary costs in this case in Mr. Rhea's reply brief are the type recoverable under the statute and Rule 54 and awards him costs of $3,692.15.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mr. Rhea is awarded permanent total disability benefits from July 24, 2026, through December 12, 2026, a period of 542 weeks totaling $407,107.04. Of that award, Titan shall pay 100 weeks, $75,112, in a lump sum. After the commutation, Titan shall pay the remaining $331,995.04 to Mr. Rhea over 542 weeks at the modified weekly rate of $612.54.

2. Mr. Rhea is awarded discretionary costs of $3,692.15.

3. Titan shall pay future medical benefits consistent with this Order under Tennessee Code Annotated section 50-6-204.[4]

4. The $150.00 filing fee is taxed to Titan Transfer, to be paid to the Court Clerk under Tennessee Compilation Rules and Regulations 0800-02-21-.06 (2026) within five business days, and for which execution might issue if necessary.

5. Titan shall prepare and submit to the Court Clerk a Statistical Data Form (SD-2) within ten business days of this order becoming final.

6. Unless appealed, this order becomes final 30 days after issuance.

---

[4] Titan requested the Court order Mr. Rhea to move out of his home into a skilled nursing facility. Mr. Rhea objected on grounds that this request was not an issue raised in litigation. The Court stated it would address the request and objection in its Order. However, after discussion, the parties agreed that either party may file a petition about any disputes as to Mr. Rhea's future medical benefits.

**ENTERED July 24, 2026.**

_Amber E. Luttrell_
**JUDGE AMBER E. LUTTRELL**
**Court of Workers' Compensation Claims**

## APPENDIX

**Exhibits:**
1. Joint Pre-Compensation Hearing Statement
2. Dr. Beebe's deposition
3. Dr. Beebe's deposition exhibits
4. Dr. Nord's deposition
5. Dr. Nadel's records
6. Dr. West's deposition
7. Dana M. Stoller's vocational report

## CERTIFICATE OF SERVICE

I certify that a copy of this order was sent as shown on July 24, 2026.

| Name | Email | Service sent to: |
|------|-------|------------------|
| Spencer Barnes, Employee's Attorney | X | spence@morrisonandbarnes.com |
| J. Allen Brown, Employer's Attorney | X | allen@jallenbrownpllc.com |

_Penny Shrum_
**PENNY SHRUM, COURT CLERK**
**wc.courtclerk@tn.gov**



<u>Right to Appeal</u>:

If you disagree with the Court's Order, you may appeal to the Workers' Compensation Appeals Board. To do so, you must:

1. Complete the enclosed form entitled "Notice of Appeal" and file it with the Clerk of the Court of Workers' Compensation Claims before the expiration of the deadline.

   ➢ If the order being appealed is "expedited" (also called "interlocutory"), or if the order does not dispose of the case in its entirety, the notice of appeal *must* be filed *within seven (7) business days* of the date the order was filed.

   ➢ If the order being appealed is a "Compensation Order," or if it resolves all issues in the case, the notice of appeal *must* be filed *within thirty (30) calendar days* of the date the Compensation Order was filed.

   When filing the Notice of Appeal, you must serve a copy on the opposing party (or attorney, if represented).

2. You must pay, via check, money order, or credit card, a **$75.00 filing fee** *within ten calendar days* after filing the Notice of Appeal. Payments can be made in-person at any Bureau office or by U.S. mail, hand-delivery, or other delivery service. In the alternative, you may file an Affidavit of Indigency (form available on the Bureau's website or any Bureau office) seeking a waiver of the filing fee. You must file the fully-completed Affidavit of Indigency *within ten calendar days* of filing the Notice of Appeal. **Failure to timely pay the filing fee or file the Affidavit of Indigency will result in dismissal of your appeal.**

3. You are responsible for ensuring a complete record is presented on appeal. If no court reporter was present at the hearing, you may request from the Court Clerk the audio recording of the hearing for a $25.00 fee. If you choose to submit a transcript as part of your appeal, which the Appeals Board has emphasized is important for a meaningful review of the case, a licensed court reporter must prepare the transcript, and you must file it with the Court Clerk. The Court Clerk will prepare the record for submission to the Appeals Board, and you will receive notice once it has been submitted. For deadlines related to the filing of transcripts, statements of the evidence, and briefs on appeal, see the applicable rules on the Bureau's website at https://www.tn.gov/wcappealsboard. (Click the "Read Rules" button.)

4. After the Workers' Compensation Judge approves the record and the Court Clerk transmits it to the Appeals Board, a docketing notice will be sent to the parties.

   **If neither party timely files an appeal with the Appeals Board, the Court Order becomes enforceable. See Tenn. Code Ann. § 50-6-239(d)(3) (expedited/interlocutory orders) and Tenn. Code Ann. § 50-6-239(c)(7) (compensation orders).**

*For self-represented litigants: Help from an Ombudsman is available at 800-332-2667.*



# NOTICE OF APPEAL

Tennessee Bureau of Workers' Compensation
www.tn.gov/workforce/injuries-at-work/
wc.courtclerk@tn.gov | 1-800-332-2667

**Docket No.:** _____

**State File No.:** _____

**Date of Injury: _____**

_____

**Employee**

v.

_____

**Employer**

Notice is given that _____

*[List name(s) of all appealing party(ies).  Use separate sheet if necessary.]*

appeals the following order(s) of the Tennessee Court of Workers' Compensation Claims to the Workers' Compensation Appeals Board (check one or more applicable boxes and include the date file-stamped on the first page of the order(s) being appealed):

☐ Expedited Hearing Order filed on _____   ☐ Motion Order filed on _____

☐ Compensation Order filed on_____   ☐ Other Order filed on_____

issued by Judge _____.

## Statement of the Issues on Appeal
Provide a short and plain statement of the issues on appeal or basis for relief on appeal:

_____

_____

_____

_____

## Parties
**Appellant(s)** (Requesting Party): _____ ☐Employer ☐Employee

Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellant \**

Employee Name: _____ Docket No.: _____ Date of Inj.: _____

**Appellee(s)** (Opposing Party): _____ ☐Employer ☐Employee

Appellee's Address: _____ Phone: _____

Email: _____

Attorney's Name: _____ BPR#: _____

Attorney's Email: _____ Phone: _____

Attorney's Address: _____

*\* Attach an additional sheet for each additional Appellee \**

### CERTIFICATE OF SERVICE

I, _____, certify that I have forwarded a true and exact copy of this Notice of Appeal by First Class mail, postage prepaid, or in any manner as described in Tennessee Compilation Rules & Regulations, Chapter 0800-02-21, to all parties and/or their attorneys in this case on this the _____ day of _____, 20 _____.

_____
*[Signature of appellant or attorney for appellant]*



**Tennessee Bureau of Workers' Compensation**
**220 French Landing Drive, I-B**
**Nashville, TN 37243-1002**
**800-332-2667**

## AFFIDAVIT OF INDIGENCY

I, _____, having been duly sworn according to law, make oath that because of my poverty, I am unable to bear the costs of this appeal and request that the filing fee to appeal be waived. The following facts support my poverty.

1. Full Name:_____    2. Address: _____

3. Telephone Number: _____    4. Date of Birth: _____

5. Names and Ages of All Dependents:

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

_____ Relationship: _____

6. I am employed by: _____

My employer's address is: _____

My employer's phone number is: _____

7. My present monthly household income, after federal income and social security taxes are deducted, is:

$ _____

8. I receive or expect to receive money from the following sources:

| | | | |
|---|---|---|---|
| AFDC | $ _____ per month | beginning | _____ |
| SSI | $ _____ per month | beginning | _____ |
| Retirement | $ _____ per month | beginning | _____ |
| Disability | $ _____ per month | beginning | _____ |
| Unemployment | $ _____ per month | beginning | _____ |
| Worker's Comp. | $ _____ per month | beginning | _____ |
| Other | $ _____ per month | beginning | _____ |

LB-1108 (REV 11/15)                                                                 RDA 11082

9. My expenses are:

Rent/House Payment $ _____ per month    Medical/Dental  $ _____ per month

Groceries          $ _____ per month     Telephone       $ _____ per month

Electricity        $ _____ per month     School Supplies $ _____ per month

Water              $ _____ per month     Clothing        $ _____ per month

Gas                $ _____ per month     Child Care      $ _____ per month

Transportation     $ _____ per month     Child Support   $ _____ per month

Car                $_____ per month

Other              $ _____ per month (describe: _____ )

10. Assets:

Automobile             $ _____     (FMV) _____

Checking/Savings Acct. $ _____

House                  $ _____     (FMV) _____

Other                  $ _____     Describe:_____

11. My debts are:

Amount Owed                    To Whom

_____            _____

_____            _____

_____            _____

_____            _____

**I hereby declare under the penalty of perjury that the foregoing answers are true, correct, and complete and that I am financially unable to pay the costs of this appeal.**

_____

APPELLANT

Sworn and subscribed before me, a notary public, this

_____ day of _____, 20_____.

_____

NOTARY PUBLIC

My Commission Expires:_____